*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* S-D A COLEMAN, JR., Minor.

UNPUBLISHED
May 30, 2024

No. 368348
Kent Circuit Court
Family Division
LC No. 18-051636-NA

Before: YATES, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order terminating his parental rights to the minor child, SC, under MCL 712A.19b(3)(a)(*ii*) and MCL 712A.19b(3)(c)(*i*). We affirm.

In his sole issue raised on appeal, respondent argues that the trial court erred by finding termination of his parental rights was in the child's best interests. We disagree.

To terminate parental rights, "the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Respondent does not challenge the statutory grounds for termination; thus, we may presume that the trial court did not clearly err by finding that the statutory grounds were established by clear and convincing evidence. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341, 353 n 10; 612 NW2d 407 (2000). And we are satisfied from our review of the record that the trial court did not clearly err when it found that the statutory grounds for termination were established by clear and convincing evidence.

Once the trial court determines that at least one of the statutory grounds has been met, the trial court must also find by a preponderance of the evidence that termination is in the child's best interests before it can terminate parental rights. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013); see also MCL 712A.19b(5). This Court reviews the trial court's finding regarding the child's best interests for clear error. *In re Trejo*, 462 Mich at 356-357. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

At the best-interest stage, the focus is on the child not the parent. *Id*. at 87. The trial court should weigh all the evidence available on the record to determine the child's best interests. *In re Trejo*, 462 Mich at 356-357. The trial court may consider several factors in this analysis, including:

> [T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted).]

The child's placement with a relative at the time of termination is an explicit factor to consider in determining whether termination is in the child's best interests and weighs against termination. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010).

Respondent argues on appeal that he had a strong child-parent bond with SC despite the trial court's finding to the contrary. Specifically, respondent contends that testimony showed that respondent and SC shared a supportive relationship and that he had phone contact with SC. Review of the testimony in this regard shows that SC told his caseworker before the termination hearing that he had a "somewhat supportive relationship" with respondent and could turn to him if he had questions. But SC's single statement that he had a "somewhat supportive relationship" with respondent is by no means indicative of a strong child-parent bond. Outside of this statement, the record shows that SC spoke negatively about respondent to his caseworker and did not miss someone who was never there for him. Further, according to the record evidence, respondent's contact with SC was limited to sporadic phone calls. Even when SC was shot, respondent did not reach out to SC after he was informed of the shooting. Outside of sporadic phone calls, SC had not seen respondent face-to-face since at least 2021. Additionally, nothing in the record indicated that respondent supported SC in any way. Accordingly, the trial court did not commit error when it determined that respondent lacked a child-parent bond with SC.

Second, respondent asserts on appeal that the trial court erroneously determined that SC's placement with his half sister served his well-being and need for permanency, stability, and finality. Respondent argues that the half sister did not provide a stable and safe home environment because: she declined to place SC in counseling; SC went absent without leave (AWOL) from her care and stole from her; SC was shot; and SC attended at least three different schools while in her care. However, when considered in the context of the whole record, SC's well-being and need for permanency, stability, and finality was best served in his half sister's care.

As respondent notes, the trial court did find that it was in SC's best interests to terminate respondent's parental rights in part because of SC's well-being in his half sister's care and his need for permanency, stability, and finality. In support of its determination that both of these factors favored termination, the trial court explained that this five-year-long case was particularly lengthy and included SC being bounced from provider to provider before he was placed with his half sister. In those other placements, SC had extreme behavioral issues. His behavior calmed down when he was placed with his half sister.

More particularly, at the start of these proceedings in 2018, SC demonstrated extreme behavioral and mental-health issues, which included 62 out-of-school suspensions, delinquency charges, and violent behavior. From 2018 through December 2021, SC was bounced from various foster homes and institutions. He was removed from his first foster home for violent and sexualized behavior that was extreme enough to require an alarm being placed on his bedroom door. In the foster homes and institutions, SC went AWOL numerous times. In one of these instances, SC assaulted a staff member, stole her keys, and then—while outside the facility—struck a police officer with a rock and punched another police officer. In his last foster placement before he was placed with his half sister, SC went AWOL twice. Likewise, during this period, SC joined a gang, got suspended from schools for behavioral issues, and acted out violently toward his caregivers.

Much of this behavior was dramatically reduced or entirely ceased during the two years that SC was in his half sister's care. SC continued to move between several schools, but his attendance increased and he was less violent. He went AWOL only once in his half sister's care in 2022. SC expressed that he wanted to stay in his half sister's care and showed a general positive change in his behavior.

Despite these significant changes in SC, respondent criticizes the half sister for feeling that it was unnecessary for SC to receive counseling after a psychological examination recommended that SC receive counseling. However, the psychological examiner indicated that SC should participate in counseling only if he became open to it. Although the half sister may have been imprudent for not placing SC in counseling at that time, this decision did not appear detrimental to SC's well-being. By the time of the termination hearing, SC was not in mental-health services. The half sister was in the position to gauge if SC was receptive to therapy. Throughout his time with his half sister, SC showed a general positive change in his behavior.

Respondent also criticizes the half sister because SC went AWOL and stole from her while under her care. However, when considered in the context of the whole record, this instance was consistent with his pattern of going AWOL. But after this final instance in December 2022, SC no longer went AWOL. Respondent also asserts that this behavior caused the half sister to pause her decision to file for guardianship, implying that she questioned whether she wanted to adopt SC. This assertion misrepresents the record. The half sister did not pause the guardianship process. Instead, the caseworker paused it because the caseworker did not know what the half sister wanted to do after SC went AWOL. Instead, the record indicates that the half sister was determined, first, to be SC's guardian, and then to adopt him when that became the more viable option.

Finally, respondent asserts that SC was shot while in his half sister's care. This cannot be fairly attributed to the half sister. SC was shot when hanging out at the park with his girlfriend. SC was not involved in any sort of incident; he was just at the wrong place at the wrong time. The shooting was neither a result of SC's actions or the half sister's parenting.

Despite these instances referred to by respondent, the record supports that SC behaved the best while in his half sister's care and showed a marked increase in his well-being. The half sister provided care for SC the longest throughout this case. The half sister's care offered the permanence and stability that SC did not get in any other placement. By the time of the termination

hearing, SC was 15 years old and approaching an age in which he would age out of care. The prospect of the half sister adopting SC was the best option for SC considering his age and the extended length of the proceedings. See *In re White*, 303 Mich App at 713-714. Remaining a ward of the court would not offer SC the permanency and stability that he had with his half sister. The trial court did not clearly err by finding that his placement with her both furthered his well-being and his need for permanency, stability, and finality.

Additionally, these were just a few of the factors that the trial court considered in its best-interests analysis. An overview of this case showed that respondent put no effort into a service plan or into supporting SC over a five-year period. See *id*. In contrast, SC found a supportive home in his half sister's care that reduced his extreme behavioral issues. The trial court did not clearly err in its determination that termination of respondent's parental rights was in the best interests of SC.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra

-4-